Filed 4/11/13  Kuehnel v. PHH Mortgage CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ERIKA KUEHNEL,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>PHH MORTGAGE,<br><br>    Defendant and Respondent. | G046510<br><br>(Super. Ct. No. 30-2010-00407237)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Glenda Sanders, Judge.  Reversed.

Law Offices of Quintana | Reynard, Lincoln B. Quintana and John S. Reynard for Plaintiff and Appellant.

Wright, Finlay & Zak, Charles C. McKenna and Peter M. Watson for Defendant and Respondent.

*        *        *

This case comes to us from a demurrer to a second amended complaint, sustained without leave to amend.[1] Demurrers favor the complainaint. All facts stated in the complaint must be assumed true, even if those facts are counterintuitive. Moreover the plaintiff receives the benefit of all reasonable inferences from those facts. (E.g., *Mosby v. Liberty Mutual Ins. Co.* (2003) 110 Cal.App.4th 995, 999.) There is indeed much in the second amended complaint in this case which is both counterintuitive and, as the trial judge correctly noted, vague. There are obvious gaps and unanswered questions. It is as if the second amended complaint had come into the court like Richard III, unfinished, sent before its time, and scarce half made up.

Be that as it may, the defendant mortgage company did not engage in what a leading treatise on civil procedure notes to be the dubious effort of forcing the plaintiff borrower to answer the unanswered questions by a series of demurrers for uncertainty.[2] Rather, the mortgage company went for a quick coup de grace, a demurrer based on the theory the forbearance agreement signed by the borrower unambiguously provided for a

---

[1] Technically, the appeal is premature. The notice of appeal was filed February 14, 2012, designating the appeal is from an order or judgment filed "12/16/11." The 12/16/11 document, however, was no judgment, but simply a minute order reflecting the defendant's demurrer to the plaintiff's second amended complaint had been sustained without leave to amend as to all causes of action. Minute orders sustaining demurrers without leave to amend, as distinct from formal judgments of dismissal, are, of course, nonappealable. (*Sisemore v. Master Financial, Inc.* (2007) 151 Cal.App.4th 1386, 1396.) However, we may take judicial notice of trial court records showing that on April 5, 2012 (after completion of the formal record on appeal), a formal judgment of dismissal was filed. Accordingly, we exercise our discretion to deem the premature notice of appeal filed in February to be from the later appealable judgment filed in April. (See Cal. Rules of Court, rule 8.104(d)(2) ["The reviewing court may treat a notice of appeal filed after the superior court has announced its intended ruling, but before it has rendered judgment, as filed immediately after entry of judgment."].)

[2] As the Rutter Group Civil Procedure Treatise notes, demurrers for uncertainty are disfavored, and "will be sustained only where the complaint is so bad that the defendant cannot reasonably respond; i.e., he or she cannot reasonably determine what issues must be admitted or denied, or what counts or claims are directed against him or her." (Rylaarsdam et al., Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2012) ¶ 7:85, p. 7(I)-39.)

The treatise goes on to say what most lawyers already know, namely that judges don't like demurrers for uncertainty: "[J]udges usually make short shrift of demurrers for uncertainty. They expect counsel to clear up any ambiguities through discovery, or stipulations, rather than by demurrer." (Rylaarsdam et al., Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2012) ¶ 7:85, p. 7(I)-39.) What is implicit in this comment is that a defendant cannot go from a complaint containing some ambiguities directly to demurrer for failure to state a cause of action without doing something short of a demurrer for uncertainty to clear up those ambiguities first.

2

payment of $12,685.89 on November 1, 2009, and the borrower had failed to allege she made that payment.

We reverse for two reasons. First, the text of the forbearance agreement did not unambiguously provide for payment of $12,685.89 on November 1, 2009. When scrutinized, the text of the agreement is larded with ambiguity. (The trial judge, more charitable than we, simply observed it was "hardly a model of clarity.") As we show below, the text was reasonably susceptible of the interpretation the payment might have been spread out "over time." Second, the reasonableness of the possibility of the payment being spread out over time is corroborated by the factual allegations of the second amended complaint, which alleges that *prior* to November 1, 2009, the mortgage company sent the borrower a payment coupon book, including payments to begin on the very date of the ostensible $12,685.89 payment. That action – at least on the limited facts before us – could readily lead a reasonable borrower to conclude the coupons reflected that the $12,685.89 – otherwise due on November 1, 2009 – might be spread out over time. Thus, the demurrer was not well taken.

FACTS

As described above, the plaintiff is entitled to all reasonable inferences from the facts stated in the complaint. The trial court could also properly take judicial notice of various real estate documents recorded by the lender. With these rules in mind, we provide our exposition of the second amended complaint against which the successful demurrer was asserted. All quotations are from the second amended complaint. We also explicitly identify where we draw reasonable inferences from the quoted facts:

In 2004, PHH Mortgage Services lent Erika Kuehnel and Justin Kerfoot $656,000 secured by a 30-year mortgage on their residence in Costa Mesa. In 2009, PHH Mortgage "erroneously marked the loan as delinquent," claiming the May and June payments had not been received in "bank-to-bank payment methods."

3

The reasonable inference from these words is that Kuehnel somehow had funds transferred to PHH, but the lender did not credit them against what was due under the loan. That inference is further supported by the allegation that Kuehnel then "contacted" PHH in "anticipation of a payment reset." PHH "stated that *Plaintiff was current* and recommended that Plaintiff enter into a forbearance agreement . . . that relieved Plaintiff of payment obligations for July, August, September and October 2009." (Italics added.) Noteworthy here are the allegations that PHH told Kuehnel that he was *current* and that the recommended relief of "payment obligations" would be for *four* months.

On July 11, 2009, Kuehnel signed a written agreement proffered by PHH concerning a "temporary hardship forbearance plan." For the moment we need only note the agreement had a line stating, "Amount Due Next Payment Date: $12,685.89." The next payment date was in November.

In October 2009, PHH sent payment coupons for payments that were to begin November 2009, running through September 2010. Kuehnel "tendered payment of the coupon amount each month in that period." PHH simply refused to credit those payments toward Kuehnel's loan.

Also in October 2009, PHH demanded $24,045.32 (the second amended complaint does not say how the demand was conveyed) on the theory that Kuehnel had not made the May 2009 payment, and was in fact "6 months past due on the loan." The assertion of a missed May 2009 payment would also be made in a letter from PHH dated December 4, 2009.

Thereafter, an agent of PHH filed a notice of default in January 2010, claiming $34,103.96 was due. The same agent recorded a notice of sale in April 2010. Foreclosure sale of the property was eventually postponed to September 14, 2010.

4

THE LITIGATION

On September 13, 2010, the day before the scheduled foreclosure, Kuehnel filed her original complaint in this action.[3]  A year later, in September 2011, Kuehnel filed a second amended complaint, listing various causes of action centered on the question of whether the forbearance agreement absolutely required a payment of $12,685.89 on November 1, 2009, or was susceptible of a reading in which Kuehnel would be able to repay that amount "over time."  PHH filed a demurrer to that pleading, contending each cause of action was meritless on the facts alleged, and the allegations supporting it were vague, ambiguous and uncertain.[4]

In December 2011, the trial judge sustained the demurrer without leave to amend.  The judge noted what we have noted as well – the allegations in the complaint were indeed vague – but did not otherwise specify how they were vague.  On the merits, the judge read the forbearance agreement to require the payment of $12,685.89 on November 1, 2009 as a condition precedent of any other benefits of the agreement, and, since Kuehnel had already had two chances to plead, felt it was clear by the time of the second amended complaint that she was not going to be able to allege she made that payment.[5]

In early January 2012, Kuehnel brought a motion for reconsideration, based on recently taken deposition testimony of PHH's "person most knowledgeable" about Kuehnel's loan who, Kuehnel argued, allegedly admitted that PHH believed her

---

[3]     While the record is not wholly clear on the point, the briefing on appeal appears to indicate foreclosure proceedings have been in abeyance since the day Kuehnel filed her original complaint.

[4]     The causes of action are:  (1) breach of contract; (2) bad faith; (3) wrongful foreclosure; (4) violation of the Rosenthal Fair Debt Collection Practices Act; (5) negligent misrepresentation; (6) negligence; and (7) accounting.

[5]     The applicable language from the minute order:  "The forebearance plan attached by plaintiff specifies that plaintiff would make an initial payment of $12,685.99.  Any other benefits under the agreement were conditioned upon timely receipt of this initial payment yet plaintiff still has not asserted she complied with this requirement."

obligation was confined to the payment coupons sent her in October. The motion was denied in early February 2012.

DISCUSSION

The core issue on appeal is whether the forbearance agreement unambiguously required Kuehnel to make a lump sum payment of $12,685.89 on or before November 1, 2009, or whether it is *reasonably* susceptible of an interpretation which would allow Kuehnel to pay the $12,685.89 over time. A few basic principles of contract interpretation are germane to the case before us: Contracts must be viewed in light of the circumstances surrounding their formation, their purposes, and the nature of the parties. (See *Frittelli, Inc. v. 350 North Canon Drive, LP* (2011) 202 Cal.App.4th 35, 50.) When language is explicit and clear, it governs. (See *Palmer v. Truck Ins. Exchange* (1999) 21 Cal.4th 1109, 1115.) On the other hand, if the text of a contract is ambiguous or uncertain, its terms must be construed in the sense the promisor believed at the time of the making of the contract the promisee understood them. (Civ. Code, § 1649.) And if there's still uncertainty after application of these basic rules, the language must be construed "most strongly" against the party who drafted the contract. (Civ. Code, § 1654.) Ambiguity requires two or more interpretations of language, each of which is reasonable and unstrained. (*Shell Oil Co. v. Winterthur Swiss Ins. Co.* (1993) 12 Cal.App.4th 715, 737.) Language must be construed in context; there is no ambiguity in the abstract. (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1265.)

A. *The Text*

There is much about the text of the forbearance contract which raises unanswered questions. But the key ambiguity concerns the juxtaposition of a statement "Amount Due Next Payment Date: $12,685.89" against a line that soon follows it, "Payments that are deferred *may be paid on your next payment due date or repaid over a period of time*." (Italics added.) One cannot dismiss this sentence as merely holding out a possibility based on some contingency (e.g., *if* the borrower qualifies for some

6

assistance program), because, on its face, the sentence is a straight-on declarative sentence describing the terms of the plan, and holding out to the reader two possibilities – either paying deferred payments on the "next payment due date" or repaying them "over a period of time." There is nothing definitive in the agreement establishing the reference to deferred payments does not include the $12,685.89 itself.

Indeed, the textual context of the repaid-over-period-of-time clause confirms the linkage between the $12,685.89 clause and the repaid-over-period-of-time clause. Underneath the $12,685.89 line is a sentence, bracketed in double asterisks – presumably to get the reader's attention – that invites the reader to "continue reading to learn more about homeowner assistance plans that may reduce the next payment amount." An ordinary reader could easily assume the "next payment amount" refers to the $12,685.89.

The trial judge assumed one could stop reading with the typographical break line separating the bottom four paragraphs from the rest of the body of the document. We cannot agree. The sentence set off in asterisks contains no language at all suggesting the terms of the plan are finished. By way of overview, the words in those four paragraphs seem to state, on their face, that they are describing the terms of the plan the borrower has entered into, as distinct from offering something on top of the existing plan in the way infomercials do ("but wait, there's more; if you call within the next 10 minutes . . .)."

Indeed, the very first of those four paragraphs contains language so broad it could even include the *complete forgiveness* of four months of payments. While we do not read it that way, it certainly does nothing to contraindicate an interpretation giving the borrower the chance to repay the aggregate total of four months of payments over time: "Under the terms of this plan, you will not be required to make your monthly mortgage payments for the period of time detailed above. In addition, you will not be assessed late [*sic*] for the duration of the forbearance."

7

B. *Surrounding Circumstances*

Having chosen to demur, PHH necessarily is stuck with Kuehnel's version of the circumstances surrounding the formation of the agreement as stated in the second amended complaint.

Several allegations are salient: One, Kuehnel was *current* at the time of the agreement. One reasonable inference is that the agreement was not necessarily a loan modification precipitated by recent unemployment or other inability of the borrower to make payments, but an accounting mechanism to straighten out PHH's error in failing to credit Kuehnel's May and June 2009 payments.

Two, plaintiff alleges PHH's accountings were in error in two major respects: First, it had failed to correctly credit Kuehnel's May and June 2009 payments. Second, in October 2009 – even before the putative November 1, 2009 payment was due – it erroneously claimed Kuehnel was behind some $24,045.32 on her mortgage. The $24,045.32 figure makes absolutely no sense at all given any of the facts alleged in the complaint or otherwise to be derived from the judicially noticed recorded documents, but it does give rise to a reasonable inference that PHH's accounting of Kuehnel's loan had, even before November 1, 2009, become riddled with errors and was in dire need of straightening out.

Three, and most importantly, prior to the putative November 1, 2009 payment, PHH sent payment coupons for payments which were to *begin November 2009*, running through September 2010, and Kuehnel thereafter "tendered payment of the coupon amount each month in that period," but PHH refused to credit those payments toward Kuehnel's loan. The fact PHH sent Kuehnel a coupon book *before* November 1 gives rise to a reasonable inference that some amounts already deferred (or even increased, as mentioned in the third paragraph) had been amortized into the coupon book. We note, in this regard, that because this case comes to us on demurrer, PHH has not yet had the opportunity to present any evidence concerning the nature and amount of the

8

coupon payments which might allow a court to exclude the possibility the payments included the repayment of the $12,685.89 "over time."

C. *Summary*

Having examined both the text of the agreement and surrounding circumstances, we are forced to reverse. This is a textbook case illustrating why ambiguous agreements need the explication of parol evidence to understand the intent of the parties. (E.g., *L.B. Research & Education Foundation v. UCLA Foundation* (2005) 130 Cal.App.4th 171, 179 ["We emphasize that our decision about whether this contract is in fact ambiguous might, given an appeal at a different stage in this case, be enhanced by the consideration of extrinsic evidence . . ., which might in the end bring us to a different conclusion . . . ."].) The bare text of the agreement is riddled with ambiguity and thus was reasonably susceptible of the conclusion Kuehnel had the option of paying the $12,685.89 either in a lump sum on November 1, 2009, or as part of a plan represented by the payment coupons sent her in October.

Of course, this is the story on demurrer. No court has yet heard PHH's side of the story. It is certainly possible that PHH's real intention was only to defer three payments – or was it four? the agreement is *that* poorly drafted – until November 1, 2009. But the text of the agreement and circumstances we know *now* are virtually impenetrable, so we cannot, at this stage, say the agreement required a November 1, 2009 payment of $12,685.89, which if not made, would constitute a default.

In light of our determination, it is premature to address the various causes of action which may, or may not, be contingent on the issue of whether the payment of $12,685.89 on November 1, 2009, was absolutely required. Moreover, in light of the prematurity of the appeal from the minute order sustaining the demurrer, there is also no need to address the question of whether Kuehnel's later motion for reconsideration was timely, or made on new facts or law, except to observe that that evidence presented on the motion – at least Kuehnel's version of it – further supports the notion the payment

9

booklet could be reasonably interpreted by Kuehnel to provide for the option of paying the $12,685.89 over time.

## DISPOSITION

The judgment is reversed. The case now returns to square one; all causes of action remain potentially viable at this point. Our determination, however, is essentially interlocutory. PHH may yet prevail. Accordingly, we do not award appellate costs now, but accord the trial judge discretion to award the appellate costs of this proceeding at the conclusion of the litigation. (*Boicourt v. Amex Assurance Co.* (2000) 78 Cal.App.4th 1390, 1404.)


BEDSWORTH, ACTING P. J.

WE CONCUR:


ARONSON, J.


THOMPSON, J.

10